IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT WISE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1701 |
| | ) | |
| COMMONWEALTH OF | ) | |
| PENNSYLVANIA DEPARTMENT | ) | |
| OF TRANSPORTATION, | ) | |
| JOSEPH SZCZUR, CAROL COLLINS, | ) | |
| and DAVID ENICK, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

CONTI, District Judge.

### Introduction

Pending before the court is a motion for summary judgment (Docket No. 23) filed by the Commonwealth of Pennsylvania Department of Transportation ("PennDOT"), Joseph Szczur ("Szczur"), Carol Collins ("Collins"), and David Enick ("Enick," and together with PennDOT, Szczur, and Collins, "defendants"). Defendants seek summary judgment in their favor with respect to all claims asserted by Robert Wise ("plaintiff" or "Wise"). Plaintiff's claims are based upon alleged retaliation after he engaged in protected speech. Plaintiff brings claims for: (1) retaliation in violation of his First Amendment right to freedom of speech under the United States Constitution, pursuant to 42 U.S.C. § 1983; and (2) retaliation in violation of the Pennsylvania Whistleblower Law, 43 PA. CONS. STAT. §§ 1421, *et seq.* After considering the submissions of the parties, defendants' motion will be denied with respect to both claims because

genuine issues of material fact exist concerning whether defendants retaliated against plaintiff in violation of § 1983 and the Whistleblower law.

### *Factual Background*

**A. Plaintiff's investigation into co-workers' waste**

PennDOT hired Wise in May 1980. (Joint Concise Statement of Material Facts ("J.C.S.") (Docket No. 44) ¶ 3.) During the relevant time period, plaintiff was employed as an equipment operator. (Id.) PennDOT has an office in Greensburg, Pennsylvania. (Id. ¶ 1.) Although Wise did not work in the Greensburg office on a daily basis, Julie Monteparte ("Monteparte") and Wise became aware of an inordinate amount of time Barbara Smith ("Smith") and Mark McKay ("McKay"), both PennDOT employees, spent socializing in the Greensburg office. (Id. ¶ 4.) Wise and Monteparte became concerned taxpayer money was being used to subsidize the time McKay and Smith spent socializing during work hours. (Id. ¶ 9.) Smith was Monteparte's immediate supervisor for a portion of the time relevant to this action. (Id. ¶ 6.)

Wise asked Monteparte to keep a record of McKay's activities in the Greensburg office. (J.C.S. ¶ 53.) Wise asserts he would have asked Monteparte to keep a similar record for any foreman, if the same concerns were raised against that foreman. (Defs.' App. (Docket No. 23), Ex. 19 ("Wise Dep. Docket No. 23") at 71-72.) Wise felt compelled to conduct an investigation into McKay's actions, because co-workers had expressed concerns about McKay to Wise, who had strong connections with the American Federation of State, County, and Municipal Employees council ("AFSCME union"). (Pl.'s App. (Docket No. 37), Tab B ("Wise Dep. Docket No. 37") at 64a-65a.) Wise's father, Roy Wise, was the council director of the AFSCME union. (Id.) The relationship between McKay and Smith, who was married to another man, was

the subject of widespread rumor among PennDOT employees. (Pl.'s App. (Docket No. 37), Tab C ("Enick Dep. Docket No. 37") at 142a; Pl.'s App. (Docket No. 39), Tab G ("Collins Dep. Docket No. 39") at 344a.) Wise recommended PennDOT compare McKay and Smith's government-issued cell phone records, examine their mailings to each other, and compare their leave and training records. (J.C.S. ¶ 70.)

Wise's investigation into McKay's conduct yielded information concerning a trip McKay took to Aruba while on sick leave, the utilization of two PennDOT trucks for personal use, and the abuse of overtime pay. (Wise Dep. Docket No. 37 at 63, 71-73; Pl.'s App. (Docket No. 38), Tab F ("Szczur Dep. Docket No. 38") at 303a-04a; Defs.' App., Tab 11 Ex. C ("Wise's Commonwealth Employee Witness Statement Docket No. 23").) Dave Mersing, an assistant manager, told Wise that McKay was on the Aruba trip. (Wise Dep. Docket No. 37 at 73.) Shortly thereafter, Monteparte informed Wise that McKay was on sick leave. (Id.) As a result of her participation in the investigation, Monteparte received a written reprimand on March 29, 2006 for divulging confidential information regarding McKay's payroll and leave records. (Defs.' App., Ex. 21.)

As early as 2000 or 2001, Wise expressed concerns to Westmoreland County managers about the amount of time McKay and Smith spent together. (Wise Dep. Docket No. 23 at 65-66.) Szczur, the district executive for Wise's district, stated the amount of information an employee should gather to support an allegation of perceived waste to a supervisor, county manager, or him was never communicated to PennDOT employees. (Pl.'s App., Tab F ("Szczur Dep. Docket No. 38") at 298a.) PennDOT encouraged employees to report concerns about waste and misconduct, even if the concerns were later proved to lack merit. (Szczur Dep. Docket No. 38 at 243a.) On May 5, 2005, Szczur, the district executive for district 12-0, and Karl Ishman,

district executive for district 11-0, issued a memorandum encouraging employees to report workplace improprieties in response to a local television exposé featuring PennDOT employees conducting personal business or otherwise not performing PennDOT business during their work hours.  (J.C.S. ¶ 11.)  Districts 11-0 and 12-0 were the districts in which PennDOT employees relevant to this lawsuit were employed. (Id.)

In or around July 2005, Wise provided Enick, the Westmoreland County maintenance manager, with specific information, generated by Monteparte's observations, about Smith and McKay. (Id. ¶¶ 16, 19.)  Enick, however, did not provide Wise with feedback concerning the investigation of McKay.  (Id. ¶ 20.)  Wise subsequently delivered to Szczur specific information about Smith and McKay – the same information he provided to Enick.  (Id. ¶ 20.)  After receiving the information, Szczur held a meeting with Wise concerning the allegations of waste against McKay and Smith.  (Id. ¶ 21.) Due to his dissatisfaction with the outcome of the meeting, Wise contacted the secretary of PennDOT – the agency's top administrator.  (Id. ¶ 22.)  Wise took this step because the secretary had previously issued letters to PennDOT employees inviting personal calls and letters to him concerning allegations of abuse and misconduct. (Pl.'s App., Tab D ("Enick Dep. Docket No. 38") at 210-11a; Pl.'s App. (Docket No. 39), Tab I at 455a.) According to an email authored by Collins, a labor relations analyst, Szczur wanted to read Wise the "riot act" for contacting the secretary.  (Pl.'s App., Tab I, Wetzel Dep. Ex. 7 at 485a.)

**B.  Defendants' alleged retaliatory actions**

On or before January 25, 2006, Szczur held a second meeting with Wise, during which Szczur ordered Wise to submit a written witness statement and all documentation he possessed concerning McKay.  (Wise Dep. Docket No. 37 at 54-55a.)  Wise complied with the order and submitted several written witness statements and documentation concerning McKay.  (Id.)  After

the meeting, Wise and Monteparte received a memorandum dated February 15, 2006 notifying them that they were under investigation for: (1) falsifying PennDOT records or providing false information; (2) loafing or other abuse of time during work hours; and (3) interfering with an employee's performance of duties by talking or other distractions. (Pl.'s App. (Docket No. 39), Tab I Ex. 5 at 491a.) Enick led the investigation into Wise's conduct. (Pl.'s App. (Docket No. 39), Tab I Ex. 6 at 497a.)

Following the investigation into Wise's conduct, PennDOT determined disciplinary action was not warranted. (Pl.'s App., Tab I Ex. 8 at 459a-60a.) While Enick did not believe Wise prepared investigative documentation concerning McKay during work hours, he believed Wise violated other work rules which warranted disciplinary action. (Enick Dep. Docket No. 38 at 215a-16a.) Enick's belief that Wise should be disciplined was contrary to PennDOT's decision. (Id.) Dale Wetzel, chief of labor relations, stated discipline was not warranted because Wise did not violate any PennDOT rule. (Wetzel Dep. Docket No. 39 at 437a.)

Enick believed Wise required an advanced form of discipline, or "shock and awe" discipline, to stop Wise from using PennDOT resources to conduct a personal vendetta against McKay. (Enick Dep. Docket No. 38 at 196d.) Enick wrote an email on March 14, 2006, three weeks after the predisciplinary conference, venting his frustration that Wise's discipline was being delayed and circumvented by authorities in Harrisburg. (Pl.'s App., Tab I ("Wetzel Dep. Docket No. 39 Ex. 10") at 486a.) Enick's frustrations stemmed from his belief that he had the "goods" on Wise, and failing to discipline Wise would prevent Enick from controlling Wise's next move. (Id.) Enick feared Wise would "grow stronger if left unpunished." (Id.)

In an email dated April 12, 2006 sent from Mellissa Mullen ("Mullen") to Collins and forwarded to Szczur, Mullen stated: "[W]e don't want to put in writing any type of language that

appears to violate an employee's right to make good faith reports or to use the tipline [*sic*] like other employees." (Pl.'s App. (Docket No. 39), Tab I Ex. 9 at 477a.) The next day, April 13, 2006 – one month after Enick's email – Enick issued a direct order to Wise. (Szczur Dep. Docket No. 39 Ex. 8 at 459a-60a.) The direct order recognized Wise had not violated the rules for which he was charged. (Id.) The direct order required Wise to seek permission from Enick before entering PennDOT's Greensburg facility. (Id.) Rick Metzler ("Metzler"), Wise's supervisor, stated he required Wise to travel to the Greensburg facility to perform work-related tasks. (Pl.'s App., Tab I ("Metzler verified statement Docket No. 39") at 499a ¶ 6.) Defendants concede plaintiff's job duties required him to visit the Greensburg facility on occasion. (J.C.S. ¶ 32.) After the direct order was issued, Enick instructed Metzler that Wise was not to go to Greensburg for any reason. (Id. ¶¶ 7, 9.) Enick further instructed Metzler to keep "Wise behind and find something for him to do at or out of the Adamsburg stockpile if the other employees had to go to Greensburg for meetings or training." (Id. ¶ 7.)

Wise asserts the direct order prevented him from attending mandatory meetings and training sessions at the Greensburg facility. (J.C.S. ¶¶ 31, 35.) Enick believed mandatory meetings at the Greensburg facility overrode Wise's need to obtain permission to enter the facility, but this belief was never communicated to Wise. (Enick Dep. Docket No. 38 at 217a.) Szczur stated some meetings held at the Greensburg facility were important because they involved safety training, and employees not in attendance would be at a disadvantage in relation to their peers. (Szczur Dep. Docket No. 38 at 264a-65a.) On one occasion after Enick issued the direct order, Wise remained outside the Greensburg facility while it was raining because he did not obtain permission to enter the facility. (Wetzel Dep. Docket No. 39 at 447a-48a.)

Wise's AFSCME union filed a grievance alleging the April 13, 2006 direct order was a

form of discipline. (Pl.'s App., Tab I ("Sgro verified statement Docket No. 39") at 506a ¶ 12.)

A typical letter of reprimand remains in an employee's personnel file for two years, and such

letters can result in imposition of more severe discipline should there be allegations of additional

rule infractions. (Id. at 505a ¶ 7.) The direct order, however, remained in Wise's personnel file

for four years, and violations of the direct order "[would] be considered insubordination and

grounds for disciplinary action." (Id. ¶ 8.) A direct order of this type had never been issued to

any other PennDOT employee. (See Id. ¶ 6; Wetzel Dep. Docket No. 39 at 454a; Szczur Dep.

Docket No. 38 at 312.)

Wise asserts the direct order prevented him from obtaining maintenance on his truck.

(J.C.S. ¶ 31.) Wise contends the direct order discouraged him from applying for promotions

because certain duties had to be performed at the Greensburg facility. (Wise Dep. Docket No. 37

at 86a-88a, 106a-07a.) After Enick issued the direct order, Wise thought his assigned workload

was more onerous and believed he was the subject of speculation and rumor among co-workers

due to his absence from the Greensburg facility. (J.C.S. ¶ 42.) Wise was embarrassed to such a

degree that he no longer wanted to go to the Greensburg facility. (J.C.S. ¶ 43.)

Wise asserts PennDOT delayed an application he submitted in July 2006 for conducting

an outside business. (Wise Dep. Docket No. 37 at 89a.) Employees were required to file a

supplementary employment request form to work outside their PennDOT employment, and

PennDOT was obligated to contact an employee within fifteen days if additional information was

needed for approval. (Id. at 89a, 94a;) Before Wise filed this lawsuit, PennDOT determined

there was no conflict between his PennDOT duties and his outside business. (Wise Dep. Docket

No. 37 at 89-94.) Wise's application, however, was lost for over a year. (Wise Dep. Docket No.

37 at 89-94.) Wise failed to include a required affidavit with the form when he filed the

application in July 2006.  (Defs.' App. (Docket No. 23), Ex. 44 ¶ 4.)  PennDOT never notified

Wise about the missing affidavit.  (Wise Dep. Docket No. 37 at 94a.)  Wise filed a second form

with the required affidavit on July 3, 2007.  (Defs.' App. Ex. 44 ¶ 5.)  The supplementary

employment request form was approved on August 6, 2007 – prior to the filing of this lawsuit on

November 20, 2007.[1]  (Id. ¶ 6.)  Wise's district human resource officer asserted the lapse in

approval did not prevent Wise from conducting business outside his PennDOT employment.  (Id.

¶ 7.)

       Wise asserts he was not the only PennDOT employee who allegedly experienced

retaliation for filing a complaint concerning McKay and Smith.  Jennifer Suter ("Suter")

complained the relationship between McKay and Smith affected her work, due to the amount of

time McKay and Smith spent together during work hours in the Greensburg office.  (Pl.'s App.,

Tab I ("Suter verified statement Docket No. 39") at 501a-02a ¶¶ 5-6.)  Suter felt compelled to

file a complaint with PennDOT's human resource department because Smith was also

romantically involved with one of Suter's subordinates, which affected Suter's job, health, and

life.  (Id. ¶ 7.)  Following her complaint, Suter received a one-day suspension.  (Id. ¶¶ 8-9.)

Suter alleges PennDOT retaliated against her by making her life difficult.  (Id.)  Suter asserted,

"Through its treatment of me and Mr. Wise, PennDOT has succeeded in creating an ongoing

hostile work environment wherein employees are reluctant to report waste and misconduct."  (Id.

¶ 11.)  Enick asserts Suter was suspended due to inappropriate content on her work computer's

hard drive, and not for making the complaint.  (Defs.' App., Tab 13 Ex. C ("Enick Dep. Docket

No. 23") at 75-76, 84.)

### C.  Plaintiff's alleged personal feud with co-worker

---

[1] On November 20, 2007, Wise filed his complaint in the court of common pleas of Westmoreland County, and notice of removal was filed in this court on December 13, 2007.  (Docket No. 1 ¶ 1.)

Prior to Enick's investigation into Wise's conduct, Wise told Enick he possessed boxes of investigative materials at home related to McKay and Smith. (Enick Dep. Docket No. 23 at 224-25.) Those materials, along with numerous conversations with Wise concerning McKay and Smith, led Enick to believe Wise was acting on a personal vendetta against McKay and Smith. (Id.) PennDOT's human resource department and Szczur briefed Enick regarding an ongoing feud involving Wise, Monteparte, McKay, and Smith, which dated back to the late 1990s. (Enick Dep. Docket No. 23 at 211.) Enick asserts the vendetta caused turmoil within the Westmoreland County organization and he recommended Wise settle his differences with McKay without involving PennDOT. (Enick Dep. Docket No. 23 at 230.)

On March 28, 2001, Smith filed a reporting data sheet for incidents of workplace violence against Wise. (Defs.' App., Ex. 15.) Wise denied the incident complained of took place and asserts no disciplinary action was taken against him. (Pl.'s Resp. to Defs.' Statement of Material Facts (Docket No. 34) ¶ 46.) On March 6, 2006, Smith filed a claim for a stress-related work injury, stating two employees were permitted to harass and threaten her, causing undue stress and aggravation and creating an unsafe and hostile work environment. (J.C.S. ¶ 74; Defs.' App., Ex. 25.)

Enick thought Monteparte was a "very diligent worker" who never "goofed-off." (Enick Dep. Docket No. 38 at 222a.) Wise's employee performance reviews were consistently positive. (Pl.'s App., Tab I Exs. 2-4 at 461-75a.)

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

The nonmoving party must point to specific affirmative evidence in the record, rather than rely upon conclusory or vague allegations or statements. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Concrete evidence must be provided for each element of each of the claims, and the evidence must be such that a reasonable fact-finder could find in the nonmoving party's favor at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "A nonmoving party, like plaintiff, must 'designate specific facts showing that there is a genuine issue for trial.'" Orenge v. Veneman, No. 04-297, 2006 WL 2711651, at *6 (W.D. Pa. Sept. 20, 2006) (citing Celotex, 477 U.S. at 324).

A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson, 477 U.S. at 248. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court may consider any evidence that would be admissible at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993); Pollack v. City of Newark, 147 F. Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

*Discussion*

The complaint sets forth two counts. Plaintiff alleges: (1) pursuant to 42 U.S.C. § 1983, defendants violated his First Amendment right to freedom of speech under the United States Constitution; and (2) defendants violated Pennsylvania's Whistleblower Law, 43 PA. CONS. STAT. §§ 1421, *et seq.* Plaintiff asserts he experienced retaliation for making good-faith reports of waste in the workplace. Plaintiff's claims are based upon the issuance of the April 13, 2006 direct order and the delay in approving the supplementary employment request form. Plaintiff argues these actions were retaliatory responses to his reporting McKay's and Smith's wasteful conduct. Defendants move for summary judgment with respect to both claims. Plaintiff and defendants rely upon the issues relevant to plaintiff's § 1983 claim as dispositive of the issues relevant to the Whistleblower Law claim. The court will first address the § 1983 claim.

**A. Section 1983 claim**

**1.      General framework**

Section 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 does not create substantive rights. Maher v. Gagne, 448 U.S. 122, 129 n.11 (1980). A plaintiff cannot prevail in an action brought under § 1983 without establishing an underlying violation of a federally protected right. Collins v. Hartker Heights, 503 U.S. 115, 119-20 (1992). "Section 1983 itself 'contains no state-of-mind requirement

independent of that necessary to state a violation' of the underlying federal right." Board of

Cnty. Comm'rs v. Brown, 520 U.S. 397, 405 (1997) (citing Daniels v. Williams, 474 U.S. 327,

330 (1986)).

### 2. Underlying federal right – First Amendment

The federal right asserted in this case arises under the First Amendment, which provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. CONST. amend. I.

"A public employee has a constitutional right to speak on matters of public concern

without fear of retaliation." Rankin v. McPherson, 483 U.S. 378, 383-84 (1987). In Connick v.

Meyers, 461 U.S. 138 (1983), the Supreme Court acknowledged the government's interest in

regulating speech of its employees in order to promote "efficiency and integrity in the discharge

of official duties, and [in maintaining] proper discipline in the public service." Connick, 461

U.S. at 150-51. Given the significant competing interests, courts must balance the public

employee's constitutionally protected interest to speak about matters of public concern against

the interests of the government employer. Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968).

To determine whether a public employee's protected speech outweighs the government's

interest in regulating such speech, the Court of Appeals for the Third Circuit adheres to a three-

part balancing test: (1) the employee must show his speech was constitutionally protected; (2)

the plaintiff must show the protected activity was a substantial or motivating factor in the alleged

retaliatory action; and (3) the defendant may defeat the plaintiff's claim by demonstrating by a

preponderance of the evidence that the same retaliatory action would have been taken absent the

protected conduct. <u>Watters v. City of Phila.</u>, 55 F.3d 886, 892 (3d Cir. 1995).

Whether the speech was constitutionally protected turns on two requirements. The speech must relate to a matter of public concern. <u>Watters</u>, 55 F.3d at 892. Determining whether speech is a matter of public concern is a question of law which requires examination of the record in total – considering the content, form, and context of the speech. <u>See</u> <u>Connick</u>, 461 U.S. at 147-48 n.7. Public concerns relate to any matter of political, social, or other concern to the community. <u>Brennan v. Norton</u>, 350 F.3d 399, 412 (3d Cir. 2003). Speech involving matters of public concern must enrich or provide some value to the community. <u>Id.</u> at 413. Furthermore, speech of a purely personal nature will not qualify as a matter of public concern. <u>Connick</u>, 461 U.S. at 147; <u>Brennan</u>, 350 F.3d at 412. The Supreme Court has recognized speech motivated by a private concern may qualify as protected speech if it also addresses a matter of public concern. <u>Rankin</u>, 483 U.S. at 387 n.11. If the speech related to a matter of public concern, the plaintiff must show the public interest advanced by the speech was not outweighed by any injury the speech could cause to the interest of the state employer in promoting the efficiency of public services. <u>Watters</u>, 55 F.3d at 892; <u>Waters v. Churchill</u>, 511 U.S. 661, 686 (1994).

The second prong is composed of two separate elements. <u>Wardle v. Cnty. of Montgomery</u>, No. 05-3808, 2006 WL 2171976, at *6 (E.D. Pa. July 28, 2006). First, the threshold deterrence test requires the fact-finder to determine the alleged retaliatory action was punitive, such that it would deter a person of ordinary firmness from engaging in protected speech. <u>See</u> <u>McKee v. Hart</u>, 436 F.3d 165, 170 (3d Cir. 2006); <u>Suppan v. Dadonna</u>, 203 F.3d 228, 235 (3d Cir. 2000); <u>Wardle</u>, 2006 WL 2171976, at *6. Second, the fact-finder must be persuaded a causal connection exists between the protected speech and the alleged punitive action. <u>Wardle</u>, 2006 WL 2171976, at *6; <u>see</u> <u>McKee</u>, 436 F.3d at 169-71. The alleged

retaliation must be more than de minimis.  McKee, 436 F.3d at 170.  The Supreme Court noted

that failing to hold a birthday party for a public employee as punishment for exercising protected

speech could be considered a retaliatory act for purposes of satisfying the second prong.  Rutan,

497 U.S. at 76 n.8 (citing Rutan v. Republican Party of Illinois, 868 F.2d 943, 954 n.4 (7th Cir.

1989)).  The Court of Appeals for the Third Circuit has acknowledged acts which are de minimis

individually may be sufficiently actionable when viewed as a whole.  Suppan, 203 F.3d at 235.

### a.  First element – constitutionally protected activity

Speech addressing matters of political, social, or other concern to the community is a

public concern.  Brennan, 350 F.3d at 412.  "'[S]peech may involve a matter of public concern if

it attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of

government officials.'"  Id. (citing Connick, 461 U.S. at 148).  Public employees conducting

private affairs or business during work hours in lieu of performing work duties is a concern to

the community and thus is a matter of public concern because it involves the waste of taxpayer

money.  See Domina v. Van Pelt, 235 F.3d 1091, 1097 (8th Cir. 2000) (holding speech

concerning county employees pursuing romantic relations during work hours implicated a waste

of taxpayer money and was therefore a matter of public concern).

A newsworthy matter may support a conclusion that a public employee's speech involves

a matter of public concern.  Domina, 235 F.3d 1097 ("Heightened public interest in a particular

issue, while not dispositive, may . . . indicate that the issue is one of public concern.").  Although

this court is not aware of any news outlet reporting Wise's claims concerning PennDOT waste, a

television exposé pertaining to PennDOT waste aired prior to Wise's claims.  See Monsanto v.

Quinn, 674 F.2d 990, 997 (3d Cir. 1982) (the court's conclusion that the plaintiff's speech

concerned a public interest was "supported by the fact that the issues raised in the [plaintiff's]

letters were deemed important enough to be the subject of at least two [news reports]").  The

exposé sparked the issuance of a series of letters by PennDOT administrators and the secretary to

all employees, advising them to report any instances of waste.  The news report and PennDOT's

subsequent reaction supports the conclusion that wasteful conduct of PennDOT employees was a

matter of public concern during the time Wise engaged in the speech.

Defendants rely upon Wise's alleged personal vendetta against McKay and Smith as

evidence that plaintiff's speech was not entirely motivated by concerns for the taxpayer, and

therefore does not qualify as speech relating to a matter of public concern.  Wise stated he

initiated the investigation into perceived waste due to his concern for taxpayers.  Wise asserts he

would have conducted a similar investigation into the conduct of any foreman, if the same

concerns were raised against that foreman.  Wise argues he felt compelled to conduct an

investigation into McKay because co-workers confided their concerns about McKay to Wise,

who had connections with the AFSCME union.  The alleged extramarital relationship between

McKay and Smith was the subject of widespread rumor among PennDOT employees.

An employee's speech may be constitutionally protected even though it is motivated by a

private concern, if the speech also addresses a matter of public concern.  Rankin, 483 U.S. at 387

n.11 ("The private nature of the statement does not . . . vitiate the status of the statement as

addressing a matter of public concern.").  The court must focus on the value of the speech itself.

Brennan, 350 F.3d at 413.  Even if Wise's primary motive for reporting the wasteful conduct of

McKay and Smith to PennDOT superiors was due to a personal vendetta, the value of the speech

was that it exposed government waste.  The alleged vendetta is therefore not sufficient to render

Wise's speech purely private and unprotected.  See Bunker v. City of Olathe, 97 F. Supp. 2d

1241, 1248 (D. Kan. 2000) (holding even if the plaintiff's statements were motivated by a

personal vendetta, the motivation did not negate the fact that the speech related to matters of public concern). Because the content and value of Wise's speech concerned wasting taxpayer's money (a concern of particular interest to the media and PennDOT officials), a reasonable jury could find Wise's speech related to a matter of public concern.[2]

The court must determine next whether the speech's public interest outweighs the potential injury to PennDOT. Enick asserts Wise's interest in, and investigation into, McKay and Smith caused turmoil within PennDOT. Some disruption in an employer's place of business, however, does not necessarily defeat a plaintiff's First Amendment claim. Monsanto, 674 F.2d at 996 ("it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office"). If an employee does not have a "confidential, policymaking, or public contact role," the level of disruptiveness caused by his or her speech would probably be "minimal." Rankin v. McPherson, 483 U.S. 378, 390-91 (1987). A plaintiff's First Amendment § 1983 claim is subject to a balancing test, and disruption in the workplace is only one of several considerations. Monsanto, 674 F.2d at 996. Wise's claim is not defeated merely by allegations of some disruption in PennDOT offices. Moreover, defendants failed to provide evidence that Wise's investigation into McKay and Smith interfered with Wise's work duties. Tellingly, Wise's performance evaluations were consistently positive over the time period in which Wise conducted his investigation into McKay and Smith.

A reasonable jury could find that Wise's actions were not the sole cause of the alleged

---

[2] In Garcetti v. Ceballos, 547 U.S. 410 (2006), the Supreme Court held even when a public employee's speech relates to a matter of public concern, the speech may not be constitutionally protected if it was made in furtherance of the public employee's official duties. Id. at 1960 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."); see MARTIN A. SCHWARTZ, SECTION 1983 LITIGATION § 3.11[C], at 3-349 (4th ed. 2010). The parties do not aver, and the record does not contain, any evidence to demonstrate Wise's speech was made "pursuant to his duties" as an equipment operator. The Court's holding in Garcetti is therefore not dispositive of the issues before this court.

turmoil within PennDOT.  Enick, Szczur, and the secretary of PennDOT invited Wise's complaints.  The letters from PennDOT administrators and the secretary encouraged employees to report waste and misconduct.  In <u>Monsanto</u>, the circuit court held the disharmony in the plaintiff's department did not rise to a level sufficient to warrant a conclusion that the plaintiff's speech was unprotected.  <u>Monsanto</u>, 674 F.2d at 999.  In that case, several of the plaintiff's colleagues also voiced concerns about the management of their department.  The court in <u>Monsanto</u> found the disharmony in the department was "the result of the very problems . . . to which [the plaintiff's] letters were directed, rather than a result of [the plaintiff's] letter writing activity itself."  <u>Id.</u>  The court did not fault the plaintiff for his persistence, holding the plaintiff's voluminous letter writing did not strip his speech of its protective quality.  <u>Id.</u>

Here, Wise submitted a considerable amount of data concerning the daily activities of McKay and Smith.  Wise addressed his concerns to several PennDOT officials, including the secretary.  Enick and Szczur expressed frustration with Wise because he persistently reported the alleged waste after they made clear to Wise they had taken appropriate action against McKay and Smith.  Defendants allege generally that the extenuating circumstances of Wise's reporting of waste created "turmoil" in Westmoreland County.  Under <u>Monsanto</u>, these allegations of disruptive behavior are not enough to overcome the valid public interest advanced by Wise's speech.  Wise's persistence does not render his speech unprotected; rather, a reasonable jury could conclude that his speech was appropriate in light of PennDOT's requests for employee reports of waste, as well as co-worker complaints concerning the same wasteful conduct.  A reasonable jury could find Wise's speech about wasting taxpayer money outweighed PennDOT's right to censor the speech to promote efficiency in the delivery of its public service.  <u>See</u> <u>Monsanto</u>, 674 F.2d at 999 (holding letters reporting concern for loss of tax revenue did not

cause disruption in the department and outweighed the government's right to censor the employee). Wise satisfied the first prong of his First Amendment § 1983 claim.

### b. Second element - protected activity a substantial or motivating factor for retaliatory act

With respect to the second prong of the balancing test – whether Wise's protected speech was a substantial or motivating factor in the alleged retaliatory action, the court must determine whether the direct order and the delay in approving the supplementary work request form were retaliatory actions. An act is punitive and retaliatory if a fact-finder determines the deterrence threshold test is met. See McKee, 436 F.3d at 170; Suppan, 203 F.3d at 235; Wardle, 2006 WL 2171976, at *6. The plaintiff must show the alleged retaliatory action would chill the exercise of, or deter a person of ordinary firmness from exercising, protected speech. Id. In addition to the deterrence threshold test, the plaintiff must show a causal link existed between the constitutionally protected conduct and the retaliatory act. See Lauren v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

Defendants argue the direct order and the delay in approving the supplementary employment request form were not retaliatory actions. Defendants assert these alleged retaliatory acts are de minimis and do not rise to the level of a constitutional violation. Defendants argue the direct order was not retaliatory because it did not impede Wise's professional advancement, and Wise did not need to procure permission to go to the Greensburg facility to attend mandatory meetings. Defendants argue the delay in approving the supplementary employment request form was not retaliatory because there was no intentional delay in its approval, and Wise's outside business was not impeded by the delay. Finally, defendants contend no causal connection existed between Wise's report of waste and the alleged retaliatory actions. Defendants argue the direct order was issued in response to Wise asking

Monteparte to monitor McKay's activities and obtaining McKay's personnel records; rather than in response to Wise reporting McKay's wasteful conduct.

### i.     Deterrence

"Being the victim of petty harassments in the workplace as a result of speaking on matters of public concern is in itself retaliation – even if the employee cannot prove a change in the actual terms of his or her employment . . . ." McKee, 436 F.3d at 170.  Not all retaliatory acts in response to protected speech, however, are actionable under § 1983.  Acts which are de minimis do not rise to the level of a constitutional violation.  Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000) (a supervisor's failure to use an employee's job title and to capitalize the employee's name were not actionable instances of retaliation because they were de minimis).  In Brennan, the court of appeals acknowledged:  "[C]ourts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands."  Brennan, 350 F.3d at 419 (citing Suarez, 202 F.3d at 686).

A plaintiff demonstrates a cognizable First Amendment § 1983 claim when the employer engaged in a "campaign of retaliatory harassment," even if the employee cannot prove a causal connection between the alleged retaliation and an adverse affect on his terms of employment. See McKee, 436 F.3d at 169-70.  A campaign of retaliatory harassment exists when the cumulative impact of trivial actions surpass the de minimis standard.  See Brennan, 350 F.3d at 422 n.17.  De minimis acts, which in isolation would not be actionable, may be actionable when viewed in toto.  Id.

Plaintiff argues defendants subjected him to a campaign of retaliatory harassment which culminated in the issuance of the direct order and delaying the approval of the supplementary

employment request form.  Although PennDOT determined Wise's investigatory conduct did not warrant disciplinary action, Enick believed Wise required a form of advanced or "shock and awe" discipline to stop Wise's disruptions regarding McKay.  Enick issued the direct order that required Wise to procure permission from Enick before entering the Greensburg facility.

Wise's AFSCME union filed a grievance alleging the direct order was a form of discipline because it remained in his personnel file two years longer than a standard letter of reprimand and would result in the imposition of more severe discipline if plaintiff violated the direct order.  Various individuals indicated a direct order of this type had never been applied to any other PennDOT employee.

There is sufficient evidence in the record for a reasonable jury to find the direct order prevented Wise from conducting work in Greensburg and obtaining maintenance on his truck, and discouraged him from applying for promotions because some duties of the positions had to be performed in Greensburg.  Wise asserts his work after the direct order's issuance was more onerous, he was the subject of speculation and rumor, and he was embarrassed to such a degree that he no longer wanted to go to the Greensburg facility.

PennDOT's alleged campaign of retaliatory harassment against Wise, including the direct order, is supported by the delay in approving the supplementary employment request form. Plaintiff argues employees conducting outside business without PennDOT's approval may subject themselves to reprimand.  Defendants argue the delay was not punitive because Wise's outside business was not affected.  The Court of Appeals for the Third Circuit recognized employees need not experience an actual adverse action in order to make out a claim of retaliation for protected speech.  See Suppan, 203 F.3d at 234 (citing Rutan, 497 U.S. at 72 (rejecting the argument that an employee's First Amendment rights were not violated when the

retaliation did not affect the terms of employment because the deterrence threshold test could still be met)).  The delay in approving the supplementary employment request form may be actionable even if it did not affect Wise's outside business, so long as the delay would deter a person of ordinary firmness from exercising his constitutionally protected right to speak.

Courts reject First Amendment § 1983 claims when the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands.  Brennan, 350 F.3d at 419 (citing Suarez, 202 F.3d at 686). The direct order and the delay in approving the supplementary employment request form do not fall within these categories.  Retaliatory action, even if de minimis, is sufficient to satisfy the deterrence threshold test if other forms of retaliation exist such that their cumulative impact would deter a person of ordinary firmness from exercising his protected activity.  See McKee, 436 F.3d at 170; Suppan, 203 F.3d at 235.  Defendants' subjective intent plays no role in satisfying the threshold deterrence test.  See McKee, 436 F.3d at 170; Suppan, 203 F.3d at 235; Wardle, 2006 WL 2171976, at *6.

Even if the direct order and delay in approval were individually de minimis, taken collectively, the acts are more than de minimis.  A reasonable jury could find the direct order and delay in processing the supplementary employment request form were manifestations of a campaign of retaliatory harassment which continued to deter Wise, and would deter a person of ordinary firmness, from exercising protected speech.  A reasonable jury could find the direct order negatively impacted Wise's employment by: (1) creating obstacles to performing work-related duties; (2) threatening possible future and more severe punishment; (3) subjecting Wise to rumors; and (4) discouraging Wise from applying for promotions.  Viewing the evidence in a light most favorable to plaintiff, a reasonable jury could conclude Wise was subjected to retaliatory acts sufficient to deter a reasonable person from exercising his constitutional rights.

Defendants rely on <u>Wardle</u> for the proposition that the direct order did not affect the terms and conditions of Wise's employment and was therefore not punitive. In <u>Wardle</u>, the court held the plaintiff did not allege a cognizable First Amendment § 1983 claim because the alleged retaliatory actions involved a neutral job change and assertions of lost respect. <u>Wardle</u>, 2006 WL 2171976, at *7. <u>Wardle</u> is distinguishable from this case. In <u>Wardle</u>, the plaintiff alleged a neutral job change and a loss of respect. Wise's evidence of retaliation includes the direct order, delay in approving the supplementary employment request form, and Enick's desire to discipline Wise one month before the direct order. Tellingly, in the direct order Enick explained Wise's actions did not warrant discipline, but without explanation restricted Wise's movement while conducting required job duties. A reasonable jury could conclude these acts were not neutral; rather, they were meant to carry out Enick's desire to discipline Wise for exercising protected speech.

Defendants rely on <u>Karchnak v. Swatara Township</u>, No. 07-1405, 2009 WL 2139280, at *1 (M.D. Pa. July 10, 2009), for the proposition that a delay in approving sick leave does not qualify as an adverse employment action. Defendants equate the delay in Wise's supplementary employment request form to the delay of donated sick leave in <u>Karchank</u>. The court in <u>Karchnak</u> held a delay in approving sick leave for exercising protected speech was not a retaliatory act because there was no evidence that a delay existed, a delay was adverse, or the speech caused the delay. <u>Id.</u> at *10. Here, Wise adduced evidence sufficient to demonstrate that PennDOT, contrary to its policy, did not notify Wise about a missing affidavit and approval of the supplementary employment request form was delayed for over a year. Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could conclude Wise's speech was a substantial or motivating factor in the delay.

### ii. Causal link

With respect to the causation component of the second prong, a plaintiff may demonstrate causation by proving either:

> (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. In the absence of that proof, the plaintiff must show that from the evidence gleaned from the record as a whole the trier of the fact should infer causation.

Deflamis, 480 F.3d at 267. In or around July 2005, Wise reported McKay's alleged wasteful conduct to PennDOT administrators. On January 11, 2006, an email from Collins stated Szczur desired to read Wise the "riot act" for contacting the secretary of transportation concerning PennDOT employee waste. Wise was ordered to and provided Szczur with documentation concerning McKay on January 25, 2006. On February 15, 2006, Wise received a memorandum notifying him that he was the subject of an investigation for allegedly falsifying the documents he provided to Szczur. Enick wrote an email on March 14, 2006, proclaiming he had the "goods" on Wise, but simultaneously vented his frustration at not being able to obtain approval for disciplining Wise and Monteparte and not being able to control their next moves. Enick feared Wise and Monteparte would grow stronger if left unpunished. On April 13, 2006, Wise received the direct order. Around July 2006, Wise filed his first supplementary employment request form. Wise refiled the form over a year later because PennDOT did not comply with its own policy of providing notification regarding missing documentation within fifteen days.

The causation component does not require the plaintiff to prove a retaliatory intent was the sole or even primary reason for the punitive action; rather, the plaintiff must prove the protected speech played a substantial role in the retaliation. Suppan, 203 F.3d at 236. The record shows the direct order was issued to Wise, even after an investigation exculpated him

from the following rule infractions: (1) falsifying PennDOT records or providing false information; (2) loafing or otherwise abusing time during work hours; and (3) interfering with an employee's performance of duties by talking or other distractions. The direct order did not address Wise's speech. In Mullen's email to Collins on April 12, 2006, she stated: "[W]e don't want to put in writing any type of language that appears to violate an employee's right to make good faith reports or to use the tipline [*sic*] like other employees." (April 12, 2006 Mullen email, Docket No. 39 at 477a.)

"[W]hile there is no per se rule about relying on temporal proximity to establish causation in retaliation cases, the probative value depends on 'how proximate the events actually were, and the context in which the issue came before [the court]." Barker v. Keystone Powdered Metal Co., No. 08-75, 2010 WL 1333154, at *5 (W.D. Pa. Mar. 31, 2010) (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000)). Approximately nine months passed between the time Wise first reported waste in 2005 and the issuance of the direct order. Nine months is not unusually suggestive of a causal link between the reports of waste and the alleged retaliatory actions. Malone v. Economy Borough Mun. Auth., 669 F. Supp. 2d 582, 604 (W.D. Pa. 2009) (finding seven-month time span alone was not unusually suggestive of temporal proximity between protected activity and an alleged retaliatory act). A nine-month period, however, "'is not legally conclusive proof against retaliation.'" Marra v. Phila Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007) (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997); see Kachmar v. SunGaurd Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997) ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn.").

Because the timing of events alone does not suggest causation, Wise must adduce evidence of antagonism coupled with timing, or identify an inference of causation after examining the record as a whole. The record reflects Wise engaged in protected speech as late as January 11, 2006. In Collins' email on January 11, 2006, she acknowledged Wise directly contacted the secretary. She stated Szczur wanted to "read [Wise] the riot act for contacting the Secretary direct." (Pl.'s App., Tab I, Wetzel Dep. Ex. 7 at 485a.) On February 15, 2006, defendants issued the predisciplinary conference memorandum outlining alleged violations of work rules against Wise. A predisciplinary conference occurred on February 22, 2006, there was an on-going investigation, and the direct order was issued on April 13, 2006.

Plaintiff contacting the secretary in January 2006 and receiving the predisciplinary conference memorandum one month later, coupled with the on-going investigation, evidences a pattern of antagonism or an inference of causation between the protected activity and the retaliatory actions. Here, an alleged antagonistic act took place close in time to the protected activity. While plaintiff contacted the secretary several months after he initially spoke to Enick concerning taxpayer waste, the court may consider the entire relevant time period to determine whether a causal link existed. See Marra, 497 F.3d at 302 (recognizing "a plaintiff may rely on a 'broad array of evidence' to demonstrate a causal link between his protected activity and the adverse action taken against him") (citing Farrell, 206 F.3d at 284).

Wise's argument that he demonstrated causality is buttressed by communications from Enick purporting to have the "goods" on Wise, Enick's desire to discipline Wise, and Mullen's email warning PennDOT administrators to avoid language in the direct order that would appear to restrict Wise's whistleblowing activity. Although it is a close question, defendants' actions toward Wise spanning the nine-month time period after Wise's initial report are sufficient for a

reasonable jury to find causation.  Malone, 669 F. Supp. 2d at 603-04 (W.D. Pa. 2009) (holding a pattern of antagonism coupled with a seven-month period between the protected activity and retaliatory act satisfied the causation element).  Viewing the evidence in the light most favorable to plaintiff, there is evidence sufficient for a reasonable jury to conclude either a pattern of antagonism coupled with timing, or an inference of causation based upon the entire record satisfied the causation element of plaintiff's First Amendment § 1983 claim.

### c. Third element – retaliatory action would have been taken even in the absence of the protected conduct

A reasonable jury could conclude plaintiff satisfied his burden with respect to the first two elements.  The burden shifts to defendants to show a lack of but-for causation by a preponderance of the evidence.  Suppan, 203 F.3d at 236.  Defendants must show they would have issued the direct order and delayed approving the supplementary employment request form regardless whether Wise reported the conduct of McKay and Smith.  Following the investigation into Wise's conduct, PennDOT determined he did not deserve disciplinary action, yet he still received the direct order.  Defendants' affirmative defense could be discredited by a reasonable jury because a direct order like the one issued to plaintiff had never been issued to any other PennDOT employee.   Defendants do not point to any evidence they intended to restrict plaintiff from working at the Greensburg facility before Wise engaged in protected speech.  A reasonable jury could find the direct order would not have been issued but-for Wise's complaint.  To the contrary, the evidence would permit a reasonable jury to find Wise's speech precipitated the investigation into his conduct concerning the methods used for exposing waste, and the direct order was an alternative means of punishment after the investigation exculpated Wise. Consequently, defendants did not carry the burden of proof as a matter of law with respect to this prong.  A jury will need to determine whether defendants are liable with respect to plaintiff's

First Amendment § 1983 claim.

**B. Pennsylvania Whistleblower claim**

"Speech involving government impropriety occupies the highest rung of First Amendment protection . . . the public's substantial interest in unearthing governmental improprieties requires courts to foster legitimate whistleblowing." Swineford v. Snyder Cnty., 15 F.3d 1258, 1274 (3d Cir. 1994). The relevant section of the Pennsylvania Whistleblower Law provides:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

43 PA. CONS. STAT. § 1423(a). The Whistleblower Law applies to "public bodies," including Commonwealth agencies. 43 PA. CONS. STAT. § 1422; see Golaschevsky v. Commonwealth, 720 A.2d 757, 758 (Pa. 1998). PennDOT is therefore subject to the Whistleblower Law. The Whistleblower Law defines "waste" as "an employer's conduct or omissions which result in . . . misuse [or] loss of funds or resources belonging to or derived from the Commonwealth." 43 PA. CONS. STAT. § 1422.

In O'Rourke v. Department of Corrections, 778 A.2d 1194, 1199-1200 (Pa. 2009), the Supreme Court of Pennsylvania held the Whistleblower Law applies a shifting burden of proof. The employee must show initially by a preponderance of the evidence that he reported, in good-faith, wrongdoing prior to the employer's adverse action. 43 PA. CONS. STAT. § 1424(b). The employee must also provide evidence of a causal connection between the report of wrongdoing and the alleged retaliatory acts. O'Rourke, 778 A.2d at 1200. Once the employee satisfies those requirements, the burden shifts to the employer to prove "by a preponderance of the evidence that the action by the employer occurred for separate and legitimate reasons, which [were] not

merely pretextual." Id.  In other words, the defendant is required to show the same adverse action would have occurred absent the employee's good-faith report of wrongdoing.  Id. at 1204.

### 1.  Plaintiff's Burden

#### a.  First element – good-faith report made prior to adverse action

To satisfy the first prong, Wise must demonstrate that he reported McKay's wasteful conduct to appropriate authorities prior to receiving the direct order or the delayed approval of his supplementary employment request form.  It is not the function of the court to act as the fact-finder, but the court must determine whether there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Anderson, 477 U.S. at 249.  Consistent with the court's discussion of plaintiff's First Amendment § 1983 claim, there is evidence sufficient for a reasonable jury to conclude Wise reported in good faith the alleged wasteful conduct of McKay between July 2005 and January 11, 2006 – prior to the issuance of the direct order on April 13, 2006.

#### b.  Second element – causal connection

To satisfy this element, plaintiff must prove the adverse actions were in response to a good-faith report.  There is sufficient evidence of record for a reasonable jury to conclude the speech induced PennDOT's retaliatory actions.  Although defendants assert Wise's vendetta was the sole impetus for reporting McKay's conduct, Wise submitted evidence to show he was motivated by concerns for taxpayers and his co-workers.  Since Wise adduced sufficient evidence to satisfy the first and second elements of the Whistleblower Law, the burden shifts to defendants to establish the actions would have been taken even without the reports made by Wise.

### 2.  Defendants' burden – but-for defense

For the same reasons discussed with respect to plaintiff's First Amendment § 1983

claim, there is a genuine issue of material fact with respect to whether the direct order would have occurred absent Wise's report of wrongdoing. Under those circumstances, summary judgment cannot be granted in defendants' favor with respect to Wise's claims under the Pennsylvania Whistleblower Law.

### *Conclusion*

Viewing the facts in the light most favorable to plaintiff, the court concludes there is evidence sufficient for a reasonable jury to return a verdict in plaintiff's favor with respect to his First Amendment § 1983 claim and his Pennsylvania Whistleblower Law claim. Genuine issues of material fact exist with respect to both claims that will need to be resolved by a jury. Accordingly, the motion for summary judgment will be denied. An appropriate order will be entered.

Date: September 23, 2010                                    By the court,

                                                            /s/ JOY FLOWERS CONTI
                                                            Joy Flowers Conti
                                                            United States District Judge